## JOHN C. LORENZEN *vs.* THE "CLAVERING."

### February 10, 1904.

*Admiralty.—Right of a Pilot to Salvage in Hawaii*:   Under the prin-
ciples of maritime law applicable to the Territory of Hawaii, a pilot may
become a salvor and be entitled to salvage under circumstances that do
not call for his services as a pilot.

*Same.—Bill for Salvage.—Estoppel*:   After performance, the libellant
presented a bill "to expert pilot services rendered in getting the steam-
ship 'Clavering' off the reef, . . . one hundred dollars," which the master,
in the libellant's presence, agreed to pay.   The libellant afterwards with-
drew the bill from libellee's agents and libelled the ship for "salvage ser-
vices" for a larger amount.   *Held,* that the bill was for "salvage services,"
and that the amount claimed in the bill may be taken as a reasonable
appraisement of the value thereof.

*Construction of Word.—Meaning of "Respondent"*:   The word *respond-
ent* is not a technical one, and may properly be used for *defendant* in a suit
*in personam* or *claimant* in a suit *in rem*.   A respondent is one who re-
sponds to a suit.

In Admiralty:   Libel *in rem* for Salvage.

A. G. M. Robertson, Proctor for Libellant.
S. M. Ballou, Proctor for Libellee.

DOLE, J.   The steamship "Clavering," approaching the port
of Honolulu on the night of Sunday, the 19th day of July,
1903, ran aground at about 9:15 o'clock, a little way south-
easterly of the channel; the captain thereupon reversed the en-
gines and put them at full speed astern, showed red lights and
blew his whistle.

The libellant, a regular pilot of that port, came alongside in
his boat, at about half past ten o'clock the same evening, and
was requested by the captain to inform his agents, W. G. Irwin
& Co., that the ship was ashore, and he thereupon proceeded
to do so.   He returned at about midnight and informed the
captain that the agents would send out the tug Counselman.
This tug arrived at about two o'clock in the morning of the

20th and proceeded to pull on the ship by a hawser fastened to the port quarter. At about half past four o'clock the same morning, the hawser parted and the Counselman returned to the wharf for a new hawser, returning at about five o'clock the same morning. This time her hawser was fastened to the starboard quarter, and she proceeded to pull as before. At about eleven o'clock the same morning, the tug Fearless came out and assisted in the work of floating the ship by a hawser fastened on the port quarter. This hawser parted at about noon, and was immediately made fast again, and the tug renewed its efforts. A little after two o'clock in the afternoon, the U. S. Gun-boat Iroquois came to the assistance of the ship and pulled her by a hawser fastened to the starboard bow. After pulling her about half an hour the hawser parted and the Iroquois went into the harbor. During the time she was pulling, the Clavering moved astern several feet; the bow also swung seaward a little.

In the meantime, at about ten o'clock in the morning, a steam scow came out to the ship and a lot of deck cargo stowed aft was placed in her; then she moved forward and received cargo from about amidship.

At about quarter past three o'clock in the afternoon, the Clavering was floated off, the tugs Counselman and Fearless. both being at work pulling her, and her own propeller working under reversed engines.

The libellant claims that when he returned to the ship, at about midnight, after notifying the agents, the captain asked him to board her, and that he did so and assumed charge of her and directed the efforts thereafter made to save her, and that when he took charge of her, she was in great peril and in danger of destruction on account of her position on the reef, and that his services required great personal exertion and skill and were of great value, assisting materially in saving the ship, and prays to be allowed Five Thousand Dollars as his reasonable salvage therefor.

The captain, as intervenor and claimant, denies that he requested the libellant to board the Clavering or that upon boarding her the libellant assumed charge of her and directed the efforts thereafter made to save her, and says that the truth is that the libellant volunteered to come aboard and that thereafter he advised and assisted him, the master of the Clavering, in his efforts to save her. This allegation is supported by the evidence of the master, who testified that libellant "asked if "he should come aboard, and I said yes if he liked to, or wished "to," and by the evidence of the chief officer and the second and third mates.

In regard to the circumstances of his boarding the Clavering, the libellant testified that he asked the master "if he wanted "me aboard, he said, yes of course." The weight of evidence supports the view that he offered to come aboard and that the master assented and that thereafter the libellant advised and assisted the master in his efforts to save the vessel.

I am unable to find from the evidence that the libellant upon going aboard the vessel "assumed charge of her and directed "the efforts thereafter made to save her." It appears from the evidence of the three mates that in such operations they took their orders from the master and were not aware of any transfer of authority to libellant.

The counsel for libellee contends that no proper basis for salvage is shown; that the libellant, being a pilot, was bound to render what aid he could and was not entitled to claim as a salvor for such services.

This is not the law except in those States where statutes have been enacted to that effect, which "generally require pilots to "render aid to vessels, if possible, on their cruising grounds "whenever needed; and in cases when extraordinary risk and "danger is thereby incurred, provision is made for extra com-"pensation." (*The C. D. Bryant,* 19 Fed. Rep., 605.) The Oregon Act provides that such requirements "shall not affect "any claim for salvage arising out of services involving extra-"ordinary danger and risk."

The principle of law applicable to this Territory, is stated in the following citations from *Hobart v. Drogan, et al.,* 10 Pet., 120, and is supported by *The Wisconsin,* 30 Fed. Rep., 847:

"A pilot while acting in the strict line of his duty, however he may entitle himself to extraordinary pilotage compensation for extraordinary services as contra distinguished from ordinary services, cannot be entitled to claim salvage;" and,

"A pilot as such, is not disabled, in virtue of his office from becoming a salvor. On the contrary, whenever he performs salvage services beyond the line of his appropriate duties, or under circumstances to which those duties do not justly attach, he stands in the same relation to the property as any other salvor; that is, with a title to compensation to the extent of the merit of his services, viewed in the light of a liberal public policy."

The ship being aground, the libellant's duties as pilot were not required, and he, under the circumstances, had the same right to perform salvage services as any other person, and he proceeded to do so. At the request of the master he notified the agents of the disaster to the ship. In connection with such mission, he hailed the tug Counselman and requested it to go out to the assistance of the Clavering. When he returned to the Clavering at about midnight, he went aboard either at the master's request or his acceptance of the libellant's own offer to do so, the latter of which alternative views is herein adopted, and from that time until the vessel was floated off at a little after three o'clock the next afternoon, he advised and assisted the master in his efforts to save the vessel.

The position of the Clavering, aground on the reef, was one of danger. Much evidence has been offered by the libellant to show that "she was in great peril and in danger of destruc-"tion by virtue of her position," and by the libellee, to show that the danger was not imminent, and that the vessel had means of floating her without assistance.

It is clear to me that the position of the Clavering, aground on the reef, was one of great, though not of extreme danger.

The sea was smooth and the ground swell at the place the vessel was lying was moderate, yet enough for some time after she went aground to cause her to roll considerably and to "pound" heavily or shake, as one of the libellee's witnesses described it. The depositions taken in San Francisco where the ship was afterwards docked, show that she had received considerable damage, costing to repair the same $42,662.01.

It is also clear that the instrumentalities effecting the rescue of the ship from her perilous position, were her engines by which her propeller was worked astern during the greater part of the time she was aground, the two tugs, Counselman and Fearless, the United States Gun-boat Iroquois and the lightering of the cargo into the steam scow. The Fearless, the Iroquois and the steam scow were operating by request of the agents, the same may be said of the Counselman, although the libellant independently, upon the master's request that he would seek assistance, first informed her of the disaster and requested her to go, as soon as possible, to the assistance of the Clavering. The ship's engines were reversed and the propeller worked full speed astern by order of the master before the arrival of the libellant.

The proctor for the libellee earnestly contended that upon the showing of the evidence to the effect that the watchman at the pilot office was an elderly man, that the libellant, whose turn it was to be on duty, was at home abed and that his telephone was out of order, so that he had to be informed of the arrival of the ship off port by a boat boy on a bicycle, it would appear that the libellant was neglecting his duty at the time and that there was a general neglect of proper precautions under existing conditions, in consequence whereof the Clavering went ashore, whereby the libellant is precluded from taking advantage of the results of his own wrong by acting as a salvor. In support of this contention, the proctor for the libellee cited the local statute (Penal Code, Sec. 1192), which requires that a pilot shall "continually hold himself in readiness to conduct "vessels safely into, and out of the port for which he is ap-

"pointed." But Section 1194 of the Penal Code provides that "upon the arrival of any vessel, making the usual marine signal "for a pilot, it shall be the duty of the pilot or pilots at the "port to immediately put off to such vessel," etc.

It does not appear from the evidence in this case that the Clavering showed any signal for a pilot. Her master was not intending to come into the harbor in the night, but at the time of getting aground, was sounding for an anchorage, intending to anchor for the night.

Under the circumstances, I do not find that this contention has any important bearing on this case requiring further consideration.

The evidence shows that the value of the ship and freight at the time she was floated off from the reef was as follows:

The value of the steamer "Clavering," her hull,
  tackle, apparel and all equipment, including
  1800 tons bunker coal on board, is.............$107,400.00
The cost of repairing the damages sustained while
  the steamer was ashore, was..................  42,662.01

The value of the steamer in her damaged condition
  after she was floated off the reef, was........$ 64,737.99

VALUE OF FREIGHT.

Freight payable on Honolulu cargo.............$  1,095.81
Freight payable on San Francisco cargo........  5,665.37

                                          $  6,761.18
Less:
Expenses incurred by ship subsequent to accident in
  earning above freight .....................$  3,441.73

  Net freight saved ......................$  3,441.73

The value of the cargo on board the steamer "Clav-
ering" while she was ashore and when she was
gotten afloat was:

Cargo destined for Honolulu ..................$ 17,100.00
Cargo destined for San Francisco ............   77,200.90

Total value of cargo on board at time service
was rendered by tug boats ..................$ 94,300.90

From a careful consideration of all the evidence, I find that
the libellant's services were accepted by the master and were
in the nature of salvage and were of some value in the work
of floating the ship; that such services were rendered in con-
nection with consultations had between the master who re-
mained in charge of the vessel and the libellant, the conclusions
arrived at being sometimes carried out by the libellant and
sometimes by the ship's officers; that the services performed
by the libellant did not require, in his capacity of master
mariner, unusual personal exertion and skill; that the perform-
ance of such services was without peril to himself; and that it
does not appear from the evidence that the rescue of the ship
from her dangerous position depended on the presence of the
libellant.

After the conclusion of the libellant's services he rendered
a bill "To expert pilot services rendered in getting the steam-
"ship Clavering off the reef off Honolulu Harbor, from 11 h.
"00′ P. M. July 19th to 4 h. 00′ P. M. July 20th., 1903, One
"Hundred Dollars."

This bill the master orally, in the libellant's presence, agreed
to pay. It was afterwards withdrawn from the agents of the
libellee by the libellant who thereafter libelled the vessel for
salvage services.

Although the presentation of this bill and the master's oral
acceptance of it, may not absolutely bind the parties to such

agreement, yet the bill shows what the libellant's deliberate estimate was of the value of his services. Calling them "expert pilot services," does not change their character; they were salvage services, and without strong evidence to the contrary may be taken as a reasonable appraisement of their value; and I so decide.

"The amount of the bill which was presented by one of the owners, (of the tug Briggs) and which was made out by the Captain, indicated his and the owners' estimate, at the time, of the value of the service." *Howard v. Manhattan,* 20 Fed. Rep., 392.

"If it (the salvage service) has been rendered under circumstances which establish that the parties have voluntarily, and without any controlling necessity on the side of the proprietors of the property saved, or their agents, entered into a contract for a fixed compensation, or upon the ordinary terms of compensation for labor and services quantum meruerunt; in either case it does not alter the nature of the service as a salvage service, but only fixes the rule by which the court is to be governed in awarding the compensation. It is still a salvage contract, and a salvage compensation." *The Emulous,* 8 Fed. Cas., 706; Case No. 4480.

In the case of the *Howard Towing Ass'n. v. The J. E. Potts,* 54 Fed. Rep., 539, subsequent to the services, the parties agreed on the amount of compensation and notes were executed in full payment thereof. The libellants afterwards sued for a larger amount. The court said:

"I think, however, that the acceptance of these notes, in the absence of proof to the contrary, shows that the amount agreed upon is the proper salvage."

In the case at bar, it is true that no notes were given, but under the master's acceptance of the bill which the libellant presented, the case would appear to be governed by the authority of the *Howard Towing Ass'n. v. The J. E. Potts.*

The proctor for the intervenor and claimant filed, on August

3rd, 1903, an "offer to allow a decree to be taken against David "Barton, respondent and claimant, * * * for the sum of "One Hundred Dollars with costs to the date of this offer, to "be taxed."

Rule 72 of this court provides that "at any time not less than "thirteen days before trial the respondent or claimant may "serve upon the libellant's proctor a written offer to allow a "decree to be taken against him for the sum of money therein "specified, with costs to the date of the offer, to be taxed, which "the libellant may within one day thereafter, accept and enter "judgment accordingly; if not so accepted, and the libellant "fail to obtain a more favorable decree, he cannot recover costs "from the time of the offer."

The offer was not accepted by the libellant and he has not obtained a more favorable decree.

In less than thirteen days after this offer, to-wit, on the same day, the United States Commissioner began to take testimony in the case under an order of the court to take the same and report it to the court. This, the proctor for the libellant contends, was the beginning of the trial, and therefore the offer above referred to, with the libellant's failure to accept it within one day after it was made, does not entitle the claimant to costs thereafter to accrue.

A trial is the formal investigation and decision of a matter in issue between parties before a competent tribunal. *Steph. Pl.,* App. Note 29. If the Commissioner had had authority to report findings of fact, the proceedings before him might be regarded as the beginning of the trial; but as his duty was limited merely to taking testimony and reporting the same, the performance of such duty was not a part of the trial, though it was intimately related to it.

The proctor for the libellant also contends that inasmuch as the offer made was to allow a decree to be taken against David Barton, respondent and claimant, whereas this being a proceed-

ing *in rem* against the ship, the offer should have been to allow a decree to be taken against the ship.

The rule of the court cited on this point provides that "the "respondent or claimant" may make the offer referred to, and the proctor for libellant urges that the word "respondent" has a distinctive meaning from the word "claimant" in the rule, and refers especially to the ship, which is the security for the decree. I do not find that the word "respondent" is a technical one, but "is often used as meaning the defendant in a suit *in* "*personam* or the claimant in a suit *in rem;* and not unnaturally, "for any one who answers or responds may properly be called "a respondent." *Benedict, Adm.,* Sec. 363. Moreover, the claimant representing the owners, has filed bonds for security of the amount of decree and costs as a substitute for the attachment of the ship, which has been accepted by the proctors for the libellant.

Decree may be entered for libellant in the amount of One Hundred Dollars with costs to August 3rd, 1903, to be taxed; subsequent costs to the claimant.